**SO ORDERED.**

**SIGNED this 28 day of September, 2011.**



_Dale L. Somers_
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

_____

Designated for publication and on-line use

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re:<br>**BROOKE CORPORATION,**<br>a Kansas Corporation, et al.,<br><br>          Debtors. | **CASE NO. 08-22786**<br>**CHAPTER 7** |
| **NORTHERN CAPITAL, INC. ,**<br><br>          Plaintiff,<br>v.<br><br>**THE STOCKTON NATIONAL BANK and**<br>**BROOKE CAPITAL ADVISORS , INC.,**<br><br><br>          Defendants<br>and<br><br>**ALBERT A. RIEDERER, Chapter 7 Trustee**<br>of Brooke Corporation,<br><br>          Intervener-Defendant. | **ADV. NO. 09-6011** |

**ALBERT A. RIEDERER, Chapter 7 Trustee of Brooke Corporation,**

                         **Third-Party Plaintiff**

  **v.**

**NORTHERN CAPITAL, INC., THE STOCKTON NATIONAL BANK, ALLIANT BANK, THE BANK OF COMMERCE AND TRUST CO., MIDWEST COMMUNITY BANK, MILLEDGEVILLE STATE BANK, IOWA STATE BANK, FIRST NATIONAL BANK OF SMITH CENTER, FARLEY STATE BANK, and FIRST COMMUNITY BANK,**

                   **Third-Party Defendants.**

## MEMORANDUM OPINION AND ORDER GRANTING STOCKTON NATIONAL BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT

When the Trustee seeks to avoid allegedly preferential transfers that partially satisfied debtor's loan held by a lead bank subject to participation agreements and the lead bank transmitted the payments to the participants in accord with the participation agreements, is the lead bank the initial transferee under 11 U.S.C. § 550(a)(1)[1]?  This is a

---

[1] Future references in the text to sections of Title 11 shall be to the section only.

question of first impression presented by third-party defendant Stockton National Bank's Motion for Partial Summary Judgment.[2]  The Court has jurisdiction.[3]

**FINDINGS OF FACT.**

The material facts are uncontroverted.  On December 28, 2007, Debtor Brooke Corporation, Inc. (hereafter "Brooke") executed a promissory note, due June 28, 2008, in favor of Stockton National Bank (hereafter "Stockton") for $4,500,000 (hereafter "Note"), with interest at the rate of 10.5%, and a Security Agreement that provided security for the Note.  Brooke had proposed the loan to Stockton, solicited the loan to the others who were interested in purchasing an undivided interest in the loan, and brought potential participants to Stockton.  On the same date, Stockton entered into eight separate, but substantially identical forms, entitled Participation Certificate and Agreement (hereafter "Agreements" or "Certificates"), with Third-Party Defendants Alliant Bank, the

---

[2] Stockton National Bank appears by Terry C. Cupps and Charles R. Curran of Foulston Siefkin LLP.  Third-party defendants Alliant Bank and Bank of Commerce &Trust Co. appear by William B.  Sorensen, Jr. and Ryan M. Peck of Morris, Laing, Evans, Brock & Kennedy, Chartered.  Third party defendants Midwest Community Bank, Milledgeville State Bank, Iowa State Bank, First National Bank of Smith Center, and First Community Bank appear by Eric L. Johnson and Nathan A. Orr of Spencer Fane Britt & Browne LLP.  Albert A Riederer, Trustee of Brooke Corporation, appears by John J. Cruciani and Michael D. Fielding of Husch Blackwell Sanders LLP.

[3] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984.  Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to § 157(b)(2)(F).  There is no objection to venue or jurisdiction over the parties.  The Court has jurisdiction.

Bank of Commerce and Trust Co., Midwest Community Bank, Milledgeville State Bank, Iowa State Bank, First National Bank of Smith Center, Farley State Bank, and First Community Bank (hereafter collectively "Participants"). The Participants' aggregate percentage ownership of the Note and all related security entitle them to 94.44% of Brooke's payments on the Note (less applicable fees and expenses), and Stockton's retained ownership interest entitles it to 5.56% of any Brooke payment. On August 7, 2008, with the consent of the Participants, Brooke executed and delivered to Stockton an extension of the Note and a revision to the security agreement.

Each Agreement identifies Stockton as the "Originating Lender (Seller)" and the participant as "Participating Lender (Purchaser)." It then describes the Brooke Note as evidencing the "Loan" in favor of Seller and provides that in "consideration of the sum of $ . . . (Purchaser's Investment) Seller hereby sells and certifies to Purchaser an undivided . . . percent interest (Share), without recourse to Seller, in the Principal and interest hereafter accruing from the Loan." Each sale includes the Purchaser's share in all notes and other instruments evidencing indebtedness of Borrower in the Loan, together with all security interests in the Property securing such indebtedness. Each participant agrees to fund its portion of the Loan by forwarding the investment to Stockton and is entitled to interest at 10.25 percent on its participation interest. "Purchaser and Seller agree that Purchaser will be considered for *all purposes the legal and equitable owner of the above Share in the Loan*, related documents, and Property and will possess all applicable rights, privileges and remedies, subject to other provisions of this Agreement."

4

Seller retains the duties of holding the Loan documentation and of administering the Loan; it is entitled to an administrative fee of 25 basis points. Such administration may be undertaken as if Seller were the sole owner and holder of the Loan. Seller's duty to the Purchasers is to use the same degree of care in servicing and collecting the Loan as it would for its own account, with liability only for acts in bad faith or willful misconduct. As to payments on the Loan, the Certificates provide that "Seller will receive all Payments and apply them to Borrower's account. Payments received by Seller *under the Loan will be held for the benefit of Seller and Purchaser until the payments* are actually paid to and received by Purchaser." Stockton is required to make such distributions no later than the close of the tenth business day following receipt, subject to a penalty if funds were not remitted in accord with the Agreement.

At issue are three payments in the total amount of $487,973.29 which Stockton received from Brooke within 90 days before Brooke filed its bankruptcy petition. The payments were comprised of wire transfers of $150,000.00 and of $38,835.62 received on August 4, 2008; a check dated August 15, 2008 for $260,000 received on August 18, 2008; and a check for $39,137.67 dated August 29, 2008 received on August 29, 2008, which did not clear until September 3, 2008. Stockton retained $27,958.58 for its share of the participation and for administrative fees and timely distributed $460,014.71 to the Participants within one day of receiving the wire transfers or within one day of the checks clearing. At the time of the payments, Stockton maintained a correspondent banking relationship with Bankers' Bank of Kansas. All payments from Brooke and distributions

5

to the Participants were processed through Stockton's account at Banker's Bank, without segregation of the funds attributable to the Loan from other transactions of Stockton.

Stockton filed a proof of claim on November 25, 2008 in the Debtor's bankruptcy in the amount of $4,179,399.95 based upon a default judgment on the Note.

## THE TRUSTEE'S CLAIM, STOCKTON'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND THE POSITIONS OF THE PARTIES.

The claims asserted in this adversary proceeding include a Third-Party Complaint by the Trustee which, among other things, seeks to avoid and recover from Stockton the foregoing payments of $478,973.29 paid by Brooke on the Note as preferential transfers under § 547 from Stockton. The matter before the Court is Stockton's Motion for Partial Summary Judgment.[4] Stockton asserts that even if the Trustee could prove that the $487,973.29 in payments made to Stockton were preferential payments, Stockton had no legal dominion and control over $460,014.71 of the payments received and, with respect to these payments which were disbursed to the Participants, acted as a mere conduit so that it does not have liability to the Trustee as to these transfers as an initial transferee under § 550(a)(1).[5]

The Participants oppose the Motion, asserting that Stockton was the initial transferee as to all the payments and not a mere conduit for various reasons, including the

---

[4] Dkt. 64. Stockton does not challenge the Trustee's position that it is the initial transferee as to $27,958.58, which it retained for its share of the participation in the Note and administrative fees. Dkt. 65.

[5] Dkts. 65 and 159.

fact the Stockton was the payee of the Note.[6]  The Trustee in his initial brief opposed the

Motion,[7] but in a sur-reply brief changed his position and stated, "[T]o the extent this

Court determines that the Certificates divested Stockton of the legal ability to exercise

dominion and control over the funds paid to the Participants, such divestiture precludes

Stockton from becoming an initial transferee to the extent of the funds it was

contractually obligated and did actually transfer to the Participants."[8]

**ANALYSIS AND CONCLUSIONS OF LAW.**

Section 550(a)(1) of the Code provides "to the extent that a transfer is avoided

under section . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate,

the property transferred . . . from the initial transferee of such transfer . . .."  The Code

does not define initial transferee.  This absence and "the harsh result of an overly literal

approach to" § 550 has given rise to the conduit theory.[9]  Under this theory, as

authoritatively formulated by the Seventh Circuit in *Bonded*[10] which formulation has been

adopted in the Tenth Circuit,[11] "the minimum requirement of status as a 'transferee' is

---

[6] Dkt. 148.

[7] Dkt. 149.

[8] Dkt. 165, p. 6.

[9]  4 Norton Bankr. L. &  Prac. 3d § 70:2 (Thompson/West 2011), citing *In re Montross*, 209 B.R. 943, 948 (9th Cir. BAP 1997).

[10] *Bonded Fin. Serv., Inc. v. European Amer. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)(hereafter *"Bonded"*).

[11] *Malloy v. Citizens Bank of Sapulpa (In re First Security Mortg. Co.)*, 33 F.3d 42, 43-44 (10th Cir. 1994), *quoting Bonded*, 838 F.2d at 893.

Case 09-06011   Doc# 181   Filed 09/28/11   Page 7 of 22

dominion over the money or other asset, the right to put the money to one's own purposes."[12]  This approach recognizes that the term "transferee" must mean something different from anyone who simply touches the money, such as a "'possessor' or 'holder' or 'agent,'"[13] and provides a basis to hold that "those who act as mere 'financial intermediaries,' 'conduits' or 'couriers' are not initial transferees under § 550."[14]  "A person or entity is not the initial transferee under *Bonded* if it received no benefit from the transferred funds, had to follow instructions on how to use the funds, and would have been liable to the transferor if it had used the funds for its own purposes."[15]  The Seventh Circuit has recently characterized the *Bonded* definition as an "approach that tracks the function of the bankruptcy trustee's avoiding powers: to recoup money from the real recipient of preferential transfers."[16]  Whether a transferee is an initial transferee or conduit is a fact intensive inquiry.

For purposes of § 550(a), is a lead bank holding a note of the debtor an initial transferee or a conduit when it receives allegedly preferential payments from the debtor

---

[12] *Id.*

[13] *Bonded*, 838 F.2d at 894.

[14] *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1202 (10th Cir. 2002), quoting *Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996).

[15] *CLC Creditors' Grantor Trust v. Howard Savings Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 742 (Bankr. N.D. Ill. 2008).

[16] *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 691 (7th Cir. 2010).

8

and, in accord with the participation agreement, immediately forwards the payments to the participants? Although the case law concerning the conduit exception to initial transferee status is voluminous, research by the parties and the Court has not produced any cases answering this question. The Court therefore will examine the legal rights and obligations arising from a loan participation, the Agreements in this case, and the distinctions between a conduit and an initial transferee to resolve the status of Stockton and the Participants under § 550.

"A loan participation is an agreement in which 'two or more banks join a loan with each bank lending a portion of the amount to the borrower.'"[17] As stated by the Tenth Circuit, "[i]n a typical participation, the 'lead' [bank] . . . divides large loans into shares which it then offers for sale to other participating financial institutions,"[18] the participants. The participation agreement governs the participation relationship.[19] Participations have been classified by the courts into two large groups - those which

---

[17] Patrick J. Ledwidge, *Loan Participations Among Commercial Banks*, 51 Tenn. L. Rev. 519, 520 (1984), quoting Black's Law dictionary 1008 (5th Ed. 1997); see *First Bank of Wakeeney v. Peoples State Bank*, 12 Kan. App.2d 788, 790, 758 P.2d 236, 238 (1988) ("A true participation is a shared loan, an undertaking by one financial institution, usually called the 'lead', to divide a large loan which it has or will put on its books into shares which it then offers for sale to other 'participant' financial institutions."); Richard E. Weiner, *Rights of a Participant Bank Against a Lead Bank in a Participation Loan Agreement*, 104 Banking L.J. 529, 529 (1987) (defining loan participations as evidencing a joint venture by financial institutions designed to provide funds to "large corporate clients in cases in which it would be impossible for any single financial institution to supply the necessary amount of funds").

[18] *Hibernia Nat'l Bank v. F.D.I.C.*, 733 F.3d 1403, 1407 (10th Cir. 1984).

[19] *First Bank of Wakeeney v. Peoples State Bank*, 12 Kan. App.2d at 790, 758 P.2d at 238; *Continental Ill. Nat'l Bank and Trust Co. of Chicago v. F.D.I.C. (In re Continental Resources Corp.)*, 799 F.2d 622, 624 (10th Cir. 1986).

9

constitute sales by the lead bank to the participating banks and those which are loans to the lead bank by the participants.[20]  Where the participation agreement uses the words sale, transfer, or assignment, the transactions falls into the first category.  Under regulations of the Comptroller of the Currency, a sale permits the lead lender to subtract a participated loan, to the extent of the participation, from its loans outstanding for lending limit restrictions if the interests are sold without recourse and the participation results in a pro rata sharing of the credit risk.[21]

In this case, the Agreements unambiguously establish that Stockton sold undivided partial interests in the Brooke loan to the Participants.  Stockton is identified as the "Originating Lender" and "Seller."  The Participants are identified as "Participating Lenders" and "Purchasers."  Section 2 of the Agreements is labeled "Sale of Participation" and provides that in consideration of the Purchaser's investment, the Seller sells, without recourse to the Seller, an undivided interest in the principal and interest accruing from the Brooke loan.  The Purchasers agree to fund their respective portions of the loan by transmitting funds to the Seller.  Purchasers and Seller agree that "Purchaser will be considered for all purposes the legal and equitable owner" of the respective share of the Loan, related documents, and property.

The legal effect of the sale of interests in the Brooke loan is that each participant is "deemed to 'own' a portion of the loan and to acquire (by assignment from

---

[20] Weiner, 104 Banking L.J. at 529-530.

[21] 12 C.F.R. § 32.2.

the lead bank) all of the rights attendant thereto."[22]  The result is that the participant

receives legal title to the portion of the proceeds due under the loan that relate to its

interest, and the lead bank acts as agent to collect and service the loan on behalf of the

participant.[23]  The Stockton Agreements provide that Stockton will receive all payments

on the loan, apply them to Brooke's account, and hold the payments for the benefit of the

"Seller and Purchaser until the payments are actually paid to and received by the

Purchaser."  They require that such payments be remitted to the Purchaser "no later than

the close of the tenth business day following receipt."

        As stated above, for purposes of § 550(a)(1), the "minimum requirement of

status as a 'transferee' is dominion over the money or other asset, the *right* to put the

money to one's own purposes."[24]  "Dominion or control means *legal* dominion or

control."[25]  It requires both control and the legal right to use the funds.  Hence, a courier

delivering financial documents,[26] a bank receiving a check drawn to its order with

directions to place the proceeds in the depositor's account,[27] an attorney receiving funds

---

[22] Weiner, 104 Banking L.J. at 530.

[23] *Id.* at 530-531.

[24] *Bonded*, 838 F.2d at 893 (emphasis added).

[25] *Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141, n. 4 (5th Cir. 1993)(emphasis added).

[26] *Rupp v. Markgraf*,  95 F.3d at 941.

[27] *Bonded*, 838 F.2d at 890.

which were placed in the firm's trust account,[28] an escrow agent,[29] and a bank receiving funds with instructions to issue a cashier's check[30] have been found to be conduits and not initial transferees for purposes of § 550(a)(1). The *Bonded* definition of initial transferee has been held to mean that if the entity receiving the funds is not permitted - by law, contract, or otherwise - from using the funds as it desires, it is a mere conduit and not an "initial transferee."[31]

The Court finds that Stockton was a conduit and not the initial transferee of the $460,014.71 of the allegedly preferential payments made by Brooke on the loan which were transmitted by Stockton to the Participants. Under the Agreements, Stockton had an unequivocal legal duty to distribute the funds to the Participants within 10 days of receipt. It complied with that duty. Stockton could not, without breach of the Agreements and its legal obligation to the Purchasers, use the funds for its own purposes. As to the interests in the Loan which had been sold, when receiving the payments from Brooke, Stockton acted as administrator or agent. Since Brooke proposed the loan, solicited the loan to others who were interested in purchasing an undivided interest in the loan, and brought the participants to Stockton, it cannot be said that Brooke intended only Stockton to

---

[28] *In re Coutee*, 984 F.2d at 138.

[29] *In re Ogden*, 314 F.3d at 1190.

[30] *Rupp v. Markgraf*, 95 F.3d at 936.

[31] *Tese-Milner v. Moon (In re Moon)*, 385 B.R. 541, 552 (Bankr. S.D.N.Y. 2008), citing *In re Coutee*, 984 F.3d at 138, n.4.

12

benefit from the Loan payments.  Rather, the Participants were entitled to 94.44% of the payments as owners of undivided interests.  Finding that Stockton was a conduit, not an initial transferee, facilitates the Trustee's recovery of the money from the Participants, the real recipients of allegedly preferential transfers.

The Court rejects the four arguments made by the Participants in opposition to Stockton's memorandum.[32]  First, the Participants argue that Stockton had dominion and control over the funds because of discretion retained by the lead bank under the Agreements.  They provide Stockton could administer the Loan using its sole judgment and had discretion to "make additional advances for taxes, insurance premiums, and other items deemed necessary by Seller to collect, enforce or protect the Loan and any Property securing the Loan."  This discretion does not equate to control under the *Bonded* conduit test.  Stockton's discretion is related to the administration of the Loan, not to the distribution of Loan payments, which is the focus of the dominion test.  Stockton had no discretion regarding the distributions; they were governed by specific terms of the Agreements stating the duty to make distributions, the time distributions were to be made, and imposing a penalty if payments were not timely.  The provision regarding advances is likewise irrelevant to whether Stockton had dominion and control of the funds distributed

---

[32] Dkt. 148.  Participants at page 8 cite *In re Potter*, 386 B.R. 306, 314 (Bankr. D. Colo. 2008) for the proposition "the proper inquiry to determine status of initial transferee is directed at the first party who 'could have' exercised control."  To the extent that Participants suggest that *Potter*'s "could have" inquiry focuses on physical ability to control without legal right to control, the Court rejects this reading.  *Potter* was concerned with whether a debtor could be an initial transferee with respect to a postpetition transfer.  The contractual right of the debtor to exercise control was not an issue.

13

to the Participants.[33]  The Participants' argument that Stockton had dominion and control of the Loan payments because it had administrative discretion ignores the mandatory, specific terms of the Agreements under which Stockton acted when making the distributions to the Participants.

As their second position, the Participants argue that Stockton's debtor-creditor relationship with Brooke, as evidenced by the fact Stockton is the payee of the Brooke Note, requires characterization of Stockton as the initial transferee.  They argue that "[a]s a result of the relationship, when Stockton received funds from the Debtor it received a direct benefit in that the outstanding loan balance of Debtor was reduced. . . . The benefit it received as a creditor indicates dominion and control for purposes of an initial transferee."[34]  The Court and Stockton agree that this analysis is correct as to 5.56% of the payments, or $27,958.58.  This is the sum retained by Stockton for its share of the Brooke loan which was not sold to third parties and for administrative expenses.  Stockton benefitted from this portion of the transfers and after receipt had dominion over the payments, the right to use the funds for is own purposes.  Stockton seeks summary judgment only as to the remaining 94.44% of the payments which it transferred to the Participants.  "[T]he majority rule is that 'where a mere conduit' retains possession of

---

[33] Further, there is no evidence that expenses were advanced by Stockton.

[34] Dkt. 148, p. 9.

some portion of the funds, he will be held liable up to the amount which he retains,"[35] but not the portion of the funds transferred to the conduit for the purpose of fulfilling an obligation to make the funds available to someone else.

Contrary to the Participants' position, "the existence of a commercial relationship" between the debtor and the recipient of the transfers does not determine the issue.[36] Rather, the examination is of the transfers themselves.[37] Examination of the transfers shows that Stockton did not have dominion as to the remaining 94.44% of the payments which Stockton, as administrative agent for the Participants, in accord with the Agreements, forwarded to the Participants. Since the undivided interests in the Note had been sold to the Participants, Stockton was not a creditor of Brooke as to these interests. As to these payments the analysis is like that applied in *General Mortgage*.[38] In that case, the debtor was the original holder of a note and mortgage which it assigned to the defendant Washington Mutual, who then assigned it to Bank of America. Neither of the assignments were recorded. The trustee sought to recover from Washington Mutual prepetition and postpetition transfers made by the debtor to Washington Mutual, which

---

[35] *In re Moon*, 385 B.R. at 553, n. 34, quoting *In re 360networks (USA) Inc.*, 338 B.R. 194, n. 11 (Bankr. S.D.N.Y. 2005).

[36] *Christy v. Alexander & Alexander of New York, Inc. (In re Finley, Kumble, Wagner Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 58 (2nd Cir. 1997).

[37] *Id.* at 59.

[38] *Jensen v. Washington Mutual Bank, F.A. (In re General Mortg. Corp. of Amer., Inc.)*, 384 B.R. 617 (Bankr. M.D. Fla. 2008).

Washington Mutual then paid to Bank of America, with Washington Mutual retaining only a servicing fee. The debtor had no contractual relationship with Bank of America, the only direct contractual relationship was with Washington Mutual. Based on these facts the court concluded that Washington Mutual was acting as a conduit because it "had no legal right to use the funds for its own purposes."[39]

This distinction between the portion of the funds retained by Stockton for its retained ownership in the Brooke Note and the funds transmitted to the Participants is consistent with the cases cited by the Participants in support of its second argument. None of them consider the status of a lead bank when a loan is subject to a participation agreement or even an analogous situation. In *Granada*,[40] the trustee brought an action against a bank to recover preference payments made by the debtor general partner through partnerships. Because the debtor was a creditor of the partnerships, the partnerships were the initial transferees, not conduits. The partnerships received something from the debtor which "they could call their own."[41] In this case, the only thing which Stockton received from the Debtor which it could call its own was the $27,958.58. The Participants cite *Kaiser Steel*[42] for the proposition that the Court may

---

[39] *Id.* at 621.

[40] *Billings v. Key Bank of Utah (In re Granada, Inc.)*, 156 B.R. 303 (D. Utah 1990).

[41] *Id.* at 308.

[42] *Kaiser Steel Resources, Inc. v. Jacobs (In re Kaiser Steel Corp.)*, 110 B. R. 514, 521 (D. Colo. 1990).

16

consider whether the alleged conduit received consideration, had a beneficial interest in any of the property, and had the ability to control the disposition of the property. Applying those factors, Stockton received only $27,958.58 for its own account, had a beneficial interest in only that amount, and had the ability to control only the small percentage of the payments which it was not obligated to transfer to the Participants. *Columbia Data Products,* [43] also cited by the Participants, states, "When a creditor receives money from its debtor to pay a debt, the creditor is not a mere conduit." The Court agrees, but here that principal applies only to the portion of the Loan held by Stockton. Here Stockton received money in payment of the Brooke Note, but only 5.56% of the payment was applied to Stockton's interest in the Note. Stockton was not a creditor of Brooke as to the interests sold to the Participants.

The Participants' third argument is that Stockton is an initial transferee because it commingled the funds received from Brooke and did not hold the funds in trust. It cites *Liberty Livestock* [44] in support of the proposition that when an alleged conduit who was obligated to hold the funds in trust, commingles the funds with its own, it loses the ability to argue that it is a mere conduit.[45] It is argued that the commingling of the loan payment

---

[43] *Lowry v. Security Pacific Business Credit, Inc. (In re Columbia Data Products, Inc.),* 892 F.2d 26, 28 (4th Cir. 1989).

[44] *Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.)*, 198 B.R. 365, 372 (Bankr. D. Kan. 1996).

[45] Dkt. 148, p. 9.

17

funds with unrelated funds in Stockton's account at Bankers' Bank is sufficient to eliminate any possibility that it could be a conduit.

This objection fails for two reasons: Stockton did not agree to hold the funds in trust; and a bank's use of a correspondent bank to clear checks and to initiate and receive wire transfers on its behalf is not commingling for purposes of the conduit rule. A participation agreement defines whether the parties to a sale of an interest also intended to create a trust or fiduciary relationship.[46] The Agreements between Stockton and the participants is devoid of language evidencing intent to create a trust or fiduciary relationship. Stockton was not required to segregate the payments received on the Loan from other bank assets, but was obligated to make distributions within ten days of receipt. Stockton as seller was granted permission to administer the Loan as though it were the sole owner thereof. Stockton's duty to the Participants was the "use the same degree of care in servicing and collecting the Loan as it would for its own accounts. Seller will not be liable to Purchaser for any action taken or omitted or for any error in judgment, except for bad faith or willful misconduct." There was no trust relationship and therefore no basis to argue that there was improper commingling. Further, the commingling which is alleged arises from Stockton's use of a correspondent bank clearinghouse for wire transfers and other payments. This is ordinary business practice and has no bearing on the conduit question as applied to Stockton.

---

[46] Weiner, 104 Banking L.J. at 531-533.

18

Finally, the Participants argue that Stockton's contractual relationships with the Participant Banks do not impact its status as an initial transferee.[47]  The rationale is that a contract of a creditor of the debtor requiring it to apply funds received from the debtor to pay the creditor's own creditors does not change the fact that the debtor's creditor is using the funds for its own purposes.[48]  This principle does not apply here because the Participants are not creditors of Stockton.  The Participants are owners of a partial interest in the Brooke Note.  They funded their respective interests in the Note.  Rather than having no impact, the Participation Agreements determine Stockton's status as a conduit with respect to the $460,014.71 at issue.  As stated above, under the *Bonded* definition of initial transferee, if the entity receiving the funds is not permitted - by law, contract, or otherwise -  from using the funds as it desires, it is a mere conduit and not an "initial transferee."  As a consequence of the Agreements, Stockton did not exercise dominion over the payments which were legally the property of the Participants.  Like an attorney who places settlement funds in a trust account, to be divided between the attorney and the client,[49]  Stockton would have been subject to contractual liability if it had attempted to use the Participants' portion of the funds for its own purposes.  Since dominion means

---

[47] This argument is essentially a reformulation of a the Participants' second argument that Stockton's debtor-creditor relationship with Brooke requires characterization of Stockton as the initial transferee.  The Court therefore rejects this argument for the same reasons as discussed above.

[48] Dkt. 148, p. 10, citing *Columbia Data Products, Inc.*, 892 F.2d at 28.

[49] *See In re Moon*, 385 B.R. at 553.

19

legal dominion and control, the fact that Stockton could have violated its contractual duty to the Participants by taking the payments and spending them as it pleased makes "no difference in the analysis."[50]

The fact that Stockton filed a proof of claim for the full amount owed by Brooke on the Note does not evidence that Stockton could legally exercise dominion and control over the Brooke payments. The proof of claim was filed by Stockton to fulfill its duty to the Participants to administer the Loan "as though it were the sole owner and holder thereof."

At oral argument, counsel for the Participants brought the Court's attention to *Paloian*,[51] a recent Seventh Circuit opinion by Chief Judge Easterbrook, who also was the author of the *Bonded* opinion. *Paloian* held that a securitized asset pool trustee, although contractually bound to disperse the trust's property to investors, when it received funds in payment of notes held in the trust, was not a mere conduit and could be an initial transferee. Participants argued that *Paloian* requires denial of Stockton's motion for partial summary judgment, but the Court disagrees. The facts in *Paloian* are clearly distinguishable from the facts in this case. In 1997, Nomura had loaned the debtor hospital $50 million through HPCH, which owned the hospital's building and land. As a part of the transaction, the hospital agreed to pay HPCH additional rent and gave Nomura a security interest in the incremental rent. The Nomura loan was securitized by selling it

---

[50] *In re Coutee*, 984 F.2d at 141, n. 4.

[51] *Paloian v. LaSalle Bank, N.A.*, 619 F.3d at 699.

20

to a third party that packaged several billion dollars of commercial credit for resale to investors. The notes and the security interests were transferred to a trust, of which LaSalle Bank was the trustee. An adversary complaint, filed against the LaSalle Bank, as trustee, alleged that rent payments made by the debtor pursuant to the lease and paid to LaSalle were fraudulent transfers. LaSalle contended it was a conduit and not an initial transferee. The Seventh Circuit disagreed holding that as trustee of the securities pool, the bank trustee was the legal owner of the trust's assets. The court observed that if found to have liability for the transfers, the Trustee would draw the money from the corpus of the trust, so that the money would really come from the trust's investors, the persons for whom the transfers were made. "Instead of requiring the bankruptcy trustee to sue thousands of investors who may have received interest payments that were increased, slightly, by money from the Hospital's coffers, a single suit suffices."[52] In this case, Stockton is not a trustee of the Brooke Note. The Participants, not Stockton, are owners of the interests in the Brooke Note which were satisfied by the Brooke transfers to Stockton. Stockton holds no assets for the benefit of the Participants from which it could deduct any payments for which it might be found liable to the Trustee. The Participants are already parties to this litigation, and requiring the Trustee to recover from them rather than Stockton will not impose an administrative burden.

---

[52] *Id.* at 692.

**CONCLUSION.**

For the foregoing reasons, the Court grants Stockton's Motion for Partial Summary Judgment. There are no material facts in controversy. As a matter of law Stockton is entitled to a ruling that, assuming that the Trustee prevails on his contention that Brooke's payments of $487,973.29 to Stockton were preferential, Stockton acted as a mere conduit with respect to $460,014.71 of the payments. As to these payments, by entering into the Participation Agreements and selling interests in the Note, Stockton contracted away its legal ability to exercise dominion over the funds. For purposes of § 550(a)(1), Stockton is not the initial transferee of $460,014.71 of the transfers which the Trustee seeks to recover.

**IT IS SO ORDERED.**

###